PORTLAND AUDUBON SOCIETY, Headwaters, Lane County Audubon Society, Oregon Natural Resources Council, the Wilderness Society, Sierra Club, Inc., Siskiyou Audubon Society, Central Oregon Audubon Society, Kalmiopsis Audubon Society, Umpqua Valley Audubon Society, Natural Resources Defense Council, Plaintiffs,

v.

Manuel LUJAN, Jr., in his official capacity as Secretary, United States Department of Interior, Defendant,

and

Northwest Forest Resource Council, Huffman & Wright Logging Co., Freres Lumber Co., Inc., Lone Rock Timber Co., Inc., Scott Timber Co., Clear Lumber Manufacturing Corp., Yoncalla Timber Products, Inc., Cornett Lumber Company, Inc., the Association of O & C Counties and Benton County, Douglas County, Inc., dba Douglas County Forest Products Company, Medford Corporation, and Rogge Forest Products, Inc., Defendants–Intervenors.

Civ. No. 87–1160–FR.

United States District Court,
D. Oregon.

May 18, 1989.

Victor M. Sher, Todd D. True, Sierra Club Legal Defense Fund, Seattle, Wash., for plaintiffs Portland Audubon Soc., Headwaters, The Wilderness Soc., Sierra Club, Inc., Siskiyou Audubon Soc., Cent. Oregon Audubon Soc., Kalmiopsis Audubon Soc., Umpqua Valley Audubon Soc., and Nat. Resources Defense Council.

Michael D. Axline, John E. Bonine, Western Nat. Resources Law Clinic, University of Oregon School of Law, Eugene, Or., for plaintiffs Lane County Audubon Soc. and Oregon Nat. Resources Council.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., Roger W. Nesbit, Sp. Asst. U.S. Atty., Portland, Or., for defendant Manuel Lujan, Jr.

Mark C. Rutzick, Robert D. Nesler, Preston, Thorgrimson, Ellis & Holman, Portland, Or., for defendants-intervenors, Northwest Forest Resource Council, Huffman & Wright Logging Co., Freres Lumber Co., Inc., Lone Rock Timber Co., Inc., Scott Timber Co., Clear Lumber Mfg. Corp., Yoncalla Timber Products, Inc., Cornett Lumber Company, Inc., Douglas County, Inc., dba Douglas County Forest Products Co., Medford Corp., and Rogge Forest Products, Inc.

Phillip D. Chadsey, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for defendants-intervenors, The Ass'n of O & C Counties and Benton County.

## OPINION

FRYE, Judge:

The matters before the court are the cross-motions for summary judgment filed by the plaintiffs (# 149) and the defendant, Manuel Lujan, Jr., in his official capacity as Secretary, United States Department of Interior, hereinafter referred to as Bureau of Land Management (BLM) (# 161).

## INTRODUCTION

Plaintiffs, Portland Audubon Society, Headwaters, Lane County Audubon Society, Oregon Natural Resources Council, The Wilderness Society, Sierra Club, Inc., Siskiyou Audubon Society, Central Oregon Audubon Society, Kalmiopsis Audubon Society, Umpqua Valley Audubon Society, and Natural Resources Defense Council (hereinafter referred to as Portland Audubon Society), are environmental groups seeking to protect the habitat of the northern spotted owl in the States of Oregon and Washington.

The natural habitat of the spotted owl is old-growth timber.

Manual Lujan, in his capacity as Secretary of the United States Department of the Interior, heads the BLM which manages 2,386,500 acres of federal lands in five districts in western Oregon. The director of the BLM for the State of Oregon is in the process of selling for harvesting tracts of old-growth timber located in seven management districts within the State of Oregon.

The Northwest Forest Resources Council, eight counties within the State of Oregon, and various individual contractors were allowed to intervene.

The Portland Audubon Society filed this action seeking declaratory and injunctive relief. It asks the court to declare that the BLM's sales of old-growth timber in natural spotted owl habitat without examining, *inter alia*, new information on the spotted owl in a supplemental EIS violates the National Environmental Policy Act, 42 U.S.C.

§ 4321 *et seq.* (NEPA), and 40 C.F.R. § 1502.9(c); that defendant's Forest Resources Policy Statement is contrary to the Oregon and California Lands Act and the Federal Lands Policy and Management Act; that defendant's sales of old-growth timber which result in the death of spotted owls violate the Migratory Bird Treaty Act; that defendant's actions are not in accordance with law, contrary to 5 U.S.C. § 706(2)(A); and that defendant's actions are not in compliance with the procedures required by law, contrary to 5 U.S.C. § 706(2)(D). The Portland Audubon Society asks the court to enjoin the BLM from offering the old-growth sales and from offering any additional old-growth sales within a 2.1 mile radius of known habitat sites of the spotted owl until the BLM complies with the law. The Portland Audubon Society also seeks an award of reasonable attorney fees and costs.

After a hearing, the court entered a preliminary injunction pending the resolution of these motions for summary judgment.

### FACTS

During the late 1970's and early 1980's, the BLM conducted an intensive planning effort for its districts in western Oregon. As part of that planning effort, each district prepared one or more Environmental Impact Statement(s) pursuant to NEPA, 42 U.S.C. § 4332. From 1978 through 1983, an Environmental Impact Statement was prepared pursuant to the Timber Management Plan for each of the following districts:

| | |
|---|---|
| Josephine: | October, 1978 |
| Jackson–Klamath: | November, 1979 |
| South Coast Curry: | May, 1981 |
| Westside Salem: | January, 1982 |
| Eastside Salem: | May, 1983 |
| Eugene: | May, 1983 |
| Roseburg: | May, 1983 |

Each Environmental Impact Statement contains an evaluation of the environmental impact that is predicted from the implementation of each Timber Management Plan. Each Environmental Impact Statement sets an annual allowable timber harvest for the district or sub-district expressed in terms of millions of cubic and board feet. The annual allowable timber harvest for each district or sub-district was determined by the constraints identified in each proposed decision. Alternatives in each Environmental Impact Statement were developed to emphasize one or several management values. For example, the five management values emphasized in the Jackson–Klamath Final Timber Management Environmental Statement were:

1. No Control of Competing Vegetation;
2. Limited Investment in Timber Production;
3. Utilization of Surplus Inventory;
4. Forestry Program for the State of Oregon; and
5. No Action.

The Jackson–Klamath Final Timber Management Environmental Statement, which includes hundreds of pages, contains, among others, the following chapters:

1. Description of the Proposed Action;
2. Description of the Environment;
3. Impacts of the Proposed Action;
4. Mitigating Measures not Included in the Proposed Action;
5. Adverse Impacts that Cannot be Avoided;
6. The Relationship Between Local Short–Term Uses of Man's Environment and Long–Term Enhancement of Productivity;
7. Irreversible and Irretrievable Commitment;
8. Alternatives; and
9. Consultation and Coordination.

In Chapter 2, under the "Description of the Environment," the Jackson–Klamath Final Timber Management Environmental Statement contains the statement that the spotted owl, listed by the State of Oregon as a threatened species, is a permanent resident of the planning area. The Jackson–Klamath Final Timber Management Environmental Statement also indicates known nests of spotted owl in a map of the area. As to "Impacts of the Proposed Action," the Jackson–Klamath Final Timber

Management Environmental Statement notes as follows:

The northern spotted owl is dependent on old-growth, closed canopy forests. Pursuant to the Oregon Endangered Species Task Force recommendations, a joint agreement with the State of Oregon, U.S. Forest Service and the U.S. Fish and Wildlife Service was signed, and BLM has agreed to protect 14 pairs of owls in the Medford District. Eight of these have been assigned to the JKSYUs [Jackson and Klamath Sustained Yield Units]. The management plan calls for total protection of 300 acres of old-growth core area (if available) and an additional 900 acres to be managed to provide at least 50 percent of the acreage in stands of 30+ year-old forests. The eight pairs receiving protection may change occasionally as new pairs are located or new timber replacement stands become available.

Additional northern spotted owls in excess of the eight pairs may have their habitat reduced or eliminated if it is in a sale area. The results of this action are unknown. However, if it is assumed that all lands are at carrying capacity, then it is likely these owls would be eliminated. Two nest trees are within the boundaries of Sales 81–21 and 82–18. Five nest trees in Sales 80–22, 80–23, 81–4 and 82–20 are within one-third mile of areas scheduled for shelterwood harvest in the first 3 years. It is possible that the owls occupying these nest trees would be eliminated due to removal of their habitat.

Jackson–Klamath Final Timber Management Environmental Statement, p. 3–41. The report concludes:

Seven known nest trees are within one-third mile of proposed sale areas and individual spotted owls may be adversely impacted by clearcutting, shelterwood harvest and overstory removal. By following recommendations of the interagency management committee, the species as a whole would be only moderately affected.

*Id.*

In the final Record of Decision, Alternative 3b was chosen for implementation. The Jackson–Klamath Final Timber Management Environmental Statement describes the effect of Alternative 3b on the spotted owl as follows:

About 35 percent of the old growth currently existing on the high intensity lands of the JKSYUs would be harvested during the first decade. This could mean a 35 percent reduction of old-growth dependent species such as the northern spotted owl, redback vole and pileated woodpecker on these lands. Old growth would be eliminated on the high intensity lands of the JKSYUs by the year 2018 if this alternative were implemented.

*Id.* at 8–24.

The seven Environmental Impact Statements prepared for each of the seven districts provided the bases for adoption by the BLM of a Management Framework Plan and a Timber Management Plan for each district or sub-district. The Timber Management Plans were adopted and approved by the state director of the BLM in Records of Decision dating from 1979 through 1983. Each Record of Decision describes the nature of the Timber Management Plan that was adopted in terms of the annual allowable harvest and in terms of allocation of acreages to different types of forest.

The timber resources of the BLM in western Oregon are currently managed under these seven Timber Management Plans. Timber sales which the BLM undertakes in the seven districts of western Oregon are evaluated with reference to the applicable Environmental Impact Statement. Environmental Assessments are prepared to analyze proposed timber sales. Each Environmental Assessment is "tiered" to the pertinent Environmental Impact Statement for each Timber Management Plan.

The Timber Management Plans adopted by the BLM from 1979 through 1983 were intended to remain in effect for periods of ten years. In 1986, the Oregon director of the BLM decided to replace these plans with coordinated and simultaneous plans that would govern management of all of

the resources on BLM lands in western Oregon. Preparation of new Resource Management Plans was announced by the state director in a brochure dated May 30, 1986. This process is continuing and is expected to produce new Environmental Impact Statements and new Timber Management Plans by the end of the decade.

On September 26, 1983, the BLM and the Oregon Department of Fish and Wildlife (ODFW) entered into an agreement entitled "BLM—ODFW AGREEMENT For Spotted Owl Habitat Management on BLM Lands in Western Oregon," which provides in part as follows:

2. The parties agree that BLM will, for the next five years, manage the habitat to maintain a population of 90 pairs of spotted owls, with appropriate distribution of pairs, as a contribution to maintaining a minimum viable population in western Oregon. The parties will work cooperatively in developing habitat management plans for each of the western Oregon BLM districts to carry out the intent of the agreement. The parties will work cooperatively in allocating habitat-protected pairs between districts. Annual timber harvest plans will be reviewed by the parties to assure that the intent of this agreement is maintained.

3. No later than October 1, 1988 the parties will review any new scientific information and current conditions of spotted owl pairs and habitat to determine at that time what actions are necessary for the protection of spotted owls. This agreement shall become effective when signed by the parties hereto and shall continue in force until termination by either party upon thirty days notice in writing to the other of its intention to terminate upon a date indicated.

The BLM has continued to collect data concerning the spotted owl throughout the early 1980's and to the present. These efforts include the inventory of spotted owls, the monitoring of spotted owls, the mapping of spotted owl habitat, and research aimed at evaluating the habitat requirements of the spotted owl.

In response to requests by environmental groups, including the Portland Audubon Society, to prepare Supplemental Environmental Impact Statements on the spotted owl, the BLM decided to prepare an Environmental Assessment to allow it to determine whether the Environmental Impact Statements prepared for the Timber Management Plans should be supplemented. The state director of the BLM issued a memorandum on November 7, 1986 to district managers providing for interim protection of spotted owls pending the completion of the Environmental Assessment. The Environmental Assessment was completed and published on February 3, 1987. The conclusion of the BLM in the Environmental Assessment was that the new information about the spotted owl, which the Portland Audubon Society had provided as a basis for supplementing the Environmental Impact Statements, was too preliminary in nature to support a decision. The Environmental Assessment included a review of the anticipated impacts from implementation of the timber sales that were planned through 1990. The conclusion in the Environmental Assessment was that new information about the spotted owl that had been acquired since the adoption of the Timber Management Plans would not cause the impacts to the spotted owl of the planned timber sales to be worse than originally predicted in the Environmental Impact Statements for each Timber Management Plan. The state director of the BLM reviewed the Environmental Assessment and decided on April 10, 1987 not to supplement any of the seven Timber Management Plans or Environmental Impact Statements. In his Decision Record, the state director of the BLM states:

In summary, for five of the seven EIS areas, the EA concluded that more owl habitat sites would remain by October 1990 than was predicted to remain if the current plan continued in effect, under the most pessimistic conclusion reached in BLM analysis at the time the current plan decisions were made. For the other

two EIS areas (Westside Salem and Eugene), the EA concluded that less owl habitat sites may remain today than were predicted to remain in the previous EISs, but that timber sales planned from now through FY 1990 would not reduce these lower numbers further.

Decision Record, p. 2.

The Portland Audubon Society filed an administrative appeal to the Interior Board of Land Appeals from the state director's decision requesting immediate stays of all sales by the BLM of timber older than 200 years within a 2.1 mile radius of 289 spotted owl habitat sites. Portland Audubon Society's statement included the statement that it would regard no response to its request within thirty days as a denial of the request and an exhaustion of its administrative remedies.

On July 1, 1987, the Interior Board of Land Appeals denied the request for a stay for failure by the Portland Aubudon Society to identify the timber sales it wished to have stayed. On September 4, 1987, the Portland Audubon Society renewed its request for a stay, filing an affidavit identifying the timber sales it wished to have stayed. In this application, the Portland Audubon Society stated that it would view a failure to act on this renewed request within twenty days as a denial of its request.

The Interior Board of Land Appeals issued an order on October 13, 1987 allowing intervention in the administrative appeal by the Northwest Forest Resources Council and the Association of O & C Counties and denying motions to dismiss the appeal. The Interior Board of Land Appeals did not rule on the Portland Audubon Society's motion to stay or the motion of the Association of O & C Counties for an extension of time to file a brief in response to the Portland Audubon Society's renewed request for a stay.

On October 19, 1987, the Portland Audubon Society filed this action alleging that the decision not to prepare a supplemental Environmental Impact Statement is in violation of NEPA, the Oregon & California Lands Act (OCLA), 43 U.S.C. § 1181, the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703 *et seq.*, and the Administrative Procedures Act (APA), 5 U.S.C. §§ 553 *et seq.* On October 27, 1987, the Interior Board of Land Appeals issued an order granting an extension of time to the Northwest Forest Resources Council and the Association of O & C Counties to file a response to the renewed request of the Portland Audubon Society for a stay until November 13, 1987. The BLM and the Northwest Forest Resources Council filed responses on that day, and the BLM also filed a request for reconsideration of the order of October 13, 1987, in which its motion to transfer the appeal for decision under the planning regulations was denied. On February 28, 1988, the Interior Board of Land Appeals issued a decision upholding the BLM's decision not to supplement the Environmental Impact Statement.

On April 20, 1988, this court entered judgment for the BLM having concluded that section 314 of the continuing budget resolution withdrew this court's jurisdiction to consider the Portland Audubon Society's claims. The Portland Audubon Society sought and obtained an injunction from the Ninth Circuit on May 18, 1988.

On January 24, 1989, the Ninth Circuit Court of Appeals reversed this court's judgment of dismissal and remanded the action for further proceedings. The Ninth Circuit concluded that this court had improperly dismissed the action pursuant to Fed.R.Civ.P. 12(b)(1) under Section 314 based upon the allegations of the complaint. The Ninth Circuit stated:

When looking at the complaint as a whole it is difficult to avoid the conclusion that it challenges particular sales (activities) on grounds that remain available under the express terms of the very statute upon which the defendants rely. Accordingly, we must hold that the Section 314 savings clauses require the district court to decide how to apply the law to particular sales.

. . . .

At a trial, both sides may be able to show that owl habitat degradation was known before or after the plan was adopted. Such proof would shed light on the "new information" problem. However, that would not answer the last "provided however" clause of the section. That clause forces the decision maker to decide whether the challenge is to the plan or to particular activities. That decision must be made in the first instance by the trial court.

*Portland Audubon Society v. Hodel,* 866 F.2d 302 at 307–08 (9th Cir.1989).

The Portland Audubon Society thereafter moved this court for an injunction substantially identical to that entered and vacated by the Ninth Circuit Court of Appeals. The court granted the injunction until the court could hear and decide the motions for summary judgment. The parties have filed extensive affidavits and memoranda in support of their positions, and oral argument has been heard.

The Portland Audubon Society contends that information concerning the habitat requirements of the spotted owl shows that the spotted owl is in danger of becoming extinct due to the destruction by logging of old-growth ecosystems as dictated by existing timber management plans; that this information obligates the BLM to address the danger of extinction in a supplemental Environmental Impact Statement; and that the continued destruction of old-growth ecosystems by logging destroys the habitat of the spotted owl foreseeably resulting in the death of birds in violation of the MBTA.

The BLM and the defendant-intervenors argue that the information relied upon by the Portland Audubon Society is neither significant nor accurate and does not require the BLM to supplement the existing Environmental Impact Statements. Further, the BLM and the defendant-inter-

venors argue that all claims, other than the NEPA claim, are not properly before the court.

## THE NEW INFORMATION

The Portland Audubon Society points to a number of scientific studies that have been released since the time that the BLM completed the Environmental Impact Statements for its seven western districts, including:

1. a status review of the spotted owl by the United States Fish and Wildlife Service (1982);

2. a draft of a supplemental Environmental Impact Statement prepared by the United States Forest Service analyzing the habitat requirements of the spotted owl (1986);[1]

3. a study of the spotted owl undertaken by a Blue Ribbon panel of respected scientists for the National Audubon Society (1986);

4. an analysis of the population demographics of the spotted owl by Dr. Russell Lande (1985 and 1987); and

5. an analysis of the spotted owl prepared by a team of BLM's biologists (May 8, 1986 and January 16, 1987).

1. *A status review of the spotted owl by the United States Fish and Wildlife Service (1982)*

The report by the United States Fish and Wildlife Service states, in part:

Although numbers [of Spotted Owls] have declined, there is still a substantial population of Spotted Owls distributed throught [sic] a broad geographical area. The species situation does not meet the Endangered Species Act of 1973 definitions of either Threatened (likely to soon be endangered throughout a significant portion of its range) or Endangered (in immediate danger of extinction). Never-

---

**1.** Neither the most recent information available, including the Final Supplement to the Final Environmental Impact Statement of the Forest Service, nor the June, 1988 article of Dr. Russell Lande, can form the basis for challenging the April, 1988 decision of the state director of the BLM not to issue a supplemental Environmen-

tal Impact Statement because they were not available to the state director when his decision was made. To the extent that this information is considered, it is only relevant in evaluating the claims of the BLM and defendant-intervenors that the initial information is not accurate.

theless, the owls' dependence on large areas of old-growth coniferous forest make them extremely vulnerable. If current trends in old-growth timber harvest continue, the Northern Spotted Owl could become endangered in a relatively short time.

The plight of the Northern Spotted Owl is becoming well known, [and] some action has been taken to control further loss of habitat and maintain viable populations. For example, in Oregon the Forest Service and Bureau of Land Management have been participating in the development of a Spotted Owl management plan. This plan, as originally conceived, provided for:

1. 400 pairs of Spotted Owls in the state;

2. each provided with a home range of 300 acres of old-growth surrounded by 1,200 acres of other forest, 50% of which [was] over 30 years old;

3. habitat sufficient for 3 to 6 owls to be maintained as block management area; and

4. management areas to be located within 8 to 12 miles of one another.

Based on recent findings of more intensive research, the Oregon–Washington Interagency Wildlife Committee, a group with representation from most government entities in the two-state area, has since recommended that at least 1,000 acres of old-growth be maintained within 1.5 miles of each Spotted Owl nest site. Efforts such as those outlined above are vital to the preservation of the Northern Spotted Owl. However, their development is hampered by lack of precise or conclusive information on certain aspects of Spotted Owl population dynamics and habitat needs. We need much better data on such subjects as breeding site tenacity, dispersal of immatures, intraspecific competition, integration of new breeders into the population, and mortality/longevity, if maintenance of viable populations through management is to be assured. The number of pairs necessary to maintain a long-term viable population is also a question yet to be adequately answered.

## B. RECOMMENDATIONS

1. Continue to investigate the biology, population dynamics, and habitat requirements of the Northern Spotted Owl, with particular emphasis on the conditions which promote the maintenance of a viable population. Pairs and populations currently being impacted by timber harvest or other habitat modifications are particularly good candidates for indepth studies with important management implications.

2. Old-growth forest, the principal need of the Northern Spotted Owl, is essentially irreplaceable, and the precise characteristics of a "viable population" of Spotted Owls are unknown. Therefore, all habitat modification should be undertaken cautiously, with attention given to preserving as many management options as possible. For example, timber harvest at the perimeter of a large forest area would likely be more favorable to the Spotted Owl than would be cuts of similar volume that left smaller isolated forest tracts.

. . . .

The Northern Spotted Owl is a vulnerable species. Its need for a habitat that also has a high immediate commercial value complicates its perpetuation. Nevertheless, it is a species that has been identified as needing attention before it has been reduced to levels that are unmanageable. To prevent the endangerment or extinction of the Northern Spotted Owl, we are challenged to make comprehensive plans that will guarantee the wise and proper use of a variety of both commercial and esthetic [sic] natural resources.

The Northern Spotted Owl, A Status Review, pp. 24–25.

2. *A draft of a supplemental Environmental Impact Statement prepared by the United States Forest Service analyzing the habitat requirements of the spotted owl (1986)*

In July, 1986, the United States Forest Service prepared a lengthy two-volume document entitled "Draft Supplement to the

Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide." The draft supplement summarized current available information on the spotted owl, described the environmental relationships between the spotted owl and other resource, economic and social factors, and discussed the potential consequences of implementing either the proposed action or other alternatives. The draft supplement states, in part, as to spotted owl viability:

> The implementing regulations for the National Forest Management Act of 1976, require the Forest Service to plan the management of wildlife habitats to "maintain viable populations of existing native and desired non-native vertebrate species in the planning area." A viable population, as defined in the regulations (36 CFR 219.19), is "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area."
>
> Viability of any species is best expressed as a relative term, rather than an absolute one. This is because species and their environments are always subject to change. This dynamic situation does not allow a 100 percent assurance that any species will exist indefinitely. Further, there is no single, fixed size of a population above which a species is viable and below which it will become extinct.
>
> The assessment of the viability for the northern spotted owl population within the Pacific Northwest Region was based on a synthesis of existing data and the use of several analysis techniques. Steps in the analysis included:
>
> 1. Predictions of the amount and distribution of suitable habitat over time;
> 2. Estimates of the ability of habitat to support breeding pairs of owls; and
> 3. Analysis of genetic and demographic risks to the owls.
>
> The purpose of the analysis was to understand the implication of alternatives on northern spotted owls for this planning period (ten to 15 years) and further to assess the likelihood that owl populations would persist up to specified peri-

ods in the future. It should be recognized that changes in management will occur based on monitoring and research.

> The total habitat available for the northern spotted owl has been declining and will continue to decline as mature and old-growth forest stands are harvested. As the amount of habitat declines, it also becomes more fragmented, making it more difficult for owls to move from one patch of habitat to another. This increases the risk that one part of the owl population will become isolated from another.
>
> The decline in the amount of habitat and the increase in fragmentation make the owl more vulnerable to other threats to viability. Three major categories of these potential threats to spotted owls were analyzed. These categories were:
>
> 1. The variability of birth and death rates through time.
> 2. Loss of genetic variation.
> 3. Random catastrophes.

Draft Supplement to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide, Volume 1, pp. S–4—S–5.

The Record of Decision of the United States Forest Service that was issued on December 8, 1988 as to the Final Supplement to the Final Environmental Impact Statement contains the following rationale of the decision to implement Alternative F:

> Available information (Final Supplement, Appendix B) on spotted owl biology, habitats, and populations can be characterized by: (1) what is known with certainty, and (2) what remains unclear because interpretations are variable or research is still in progress. This decision involves natural resources, namely mature and old-growth forests, that have high values for many uses, including spotted owl habitat. Prudence dictates that my decision favor the use of information that is known with certainty. It is appropriate and necessary, however, when knowledge is incomplete to use certain information to help shape a decision and to judge the possible risks or costs of

those decisions. Our analysis used all available information to estimate long-term effects of changes that would occur during the 10 to 15 year life of a Forest Plan under each alternative on spotted owl habitats and populations, and timber supplies. Models and statistical inference were used to predict these future conditions. I realize that the results of any analysis are influenced by the characteristics and assumptions of models and methods as well as by the validity of their basic data. Further, the conclusions of analyses that weigh heavily in decisions of this sort, eventually require field verification. We cannot wait for complete field verification of all the information used in this decision. Therefore, we had to use professional judgment to interpret the relative veracity and certainty of all sources of information. In this I was most influenced by the judgment of professional biologists who have extensive field knowledge of spotted owls and their various environments.

We know a lot about spotted owls. In Oregon and Washington probably fewer than 2,000 breeding pairs of spotted owls exist, and they depend on mature and old-growth forests for survival and reproduction. The breeding pairs require large amounts of habitat within their home ranges, more in northern Washington than in southern Oregon. Young spotted owls have limited abilities to disperse from one habitat to another. Spotted owl habitats are becoming increasingly fragmented and, in some areas, isolated from the main population. And continued existence of a well-distributed population depends on a population number and distribution that provides security from factors that can eliminate a species from an area, such as local catastrophes, inbreeding, and random variations in births and deaths. These factors increase in importance as populations become smaller and as individuals in those populations become more isolated from one another. Field data and our analyses show that, without protection of spotted owl habitats outside of reserved ar-eas during the plan period of the next 10 years, environmental conditions could result in loss of spotted owls from significant parts of the species' current distribution. Therefore, based on the known biology and environmental situation, and to maintain a high level of population viability for spotted owls, I am directing that special measures be taken to protect spotted owl habitats and populations outside of reserved areas.

Unfortunately, there remains much information about spotted owls and their habitats that is unclear. This adds uncertainty to the decision. For example, we know only generally how much habitat is required by each owl pair in different parts of the planning area, how far and through what kinds of habitats young will disperse, and the long-term consequences of various combinations of population number and distribution on viability. Most of the information on these items is inferred from incomplete inventories and research, theories, models, and the professional judgment of scientists who have examined only parts of the entire situation for which policy is required. Because of this and the high value of the mature and old-growth forest resources at stake I am making this an interim decision of no more than 5 year's duration, and directly tying it to the accelerated program of management, inventory, monitoring, and research on spotted owl habitats and populations. This decision will be reviewed at any time the Spotted Owl Research, Development, and Application Program provides sufficient information, but not later than 5 years from the date of this decision. Public response to the Final Supplement shows there is considerable debate about options that will remain to protect additional habitat at the end of 5 years under this direction. It is my judgment, based on the best available field information analyzed in the Final Supplement, that sufficient options will remain at the end of the 5 year period of this decision. This information shows there are currently 4,145,000 acres of spotted owl habitat in the National Forests of Oregon

and Washington. At the end of 5 years, under this planning direction, there will still be about 3,965,000 acres of habitat, a net reduction of about 4.5 percent. Further, planned timber harvest will not so fragment the habitat as to preclude options to increase the long-term level of protection provided in future years should new information show that is necessary.

Record of Decision, USDA Forest Service, pp. 3–4.

3. *A study of the spotted owl undertaken by a blue ribbon panel of respected scientists for the National Audubon Society (1986)*

The National Audubon Society asked a blue ribbon panel of renowned experts on wildlife to assess the status and prospects of the spotted owl insofar as the current information allows, to specify priorities for future research, and to identify management strategies that would assure maintenance of a viable population over the long term. The panel included both ecologists and ornithologists, none of whom had taken part in the controversy over the spotted owl in the Pacific Northwest. The panel considered published as well as unpublished information, conducted a series of hearings, met with United States Forest Service representatives, and reviewed the relevant parts of the general literature concerning population genetics, demography, and the biology of extinct, threatened and endangered species. The published report was directed to prominent concerns and needs regarding the spotted owl over its range in Washington, Oregon, northwest California, and the Sierra Nevada, rather than dealing with the status of the spotted owl only in a particular administrative jurisdiction of any single agency.

The report offers the following population estimates:

Because the Spotted Owl is a secretive animal that inhabits relatively inaccessible sites, its precise number is not known. As concern over the owl's viability mounted and research efforts increased, previous estimates were found to be asymptotic and there is no reason to expect previously undetected owls to boost the current figure substantially. E.D. Forsman (pers. comm.) testified that there are approximately 1500 Spotted Owl sites in Oregon, of which about half currently are definitely occupied by pairs; of the remaining half, some fraction is occupied. L.W. Brewer and H.L. Allen (pers. comm.; USDA Forest Service 1986) estimated 500–600 pairs in Washington. G.I. Gould, Jr., testified that there are about 1460 known sites (where a pair of owls has been observed, young have been found between May and September, or a vocal defense of the area has been heard or solicited) of both subspecies in California (the majority of which are in the range of the Northern Spotted Owl), and that there might well be about 2100 such sites in total. By no means all of these are inhabited; for the known sites, pairs have been seen recently in 47%.

The Ministry of Environment in British Columbia detected just four sites occupied by Northern Spotted Owls in 1984 (USDA Forest Service 1986). Thus, it is likely that there are between 4000 and 6000 individuals in the Pacific states.

Report of the Advisory Panel on the Spotted Owl, pp. 15–16.

The report offers, in part, the following comments on extinction:

One might argue that species composed of few individuals can persist over time and that several hundred pairs of Spotted Owls should be sufficient to preserve the species in the area dealt with in this report: Oregon, Washington, northwest California, and the Sierra Nevada. The Whooping Crane, Snail Kite, and, possibly, Kirtland's Warbler ... might be regarded as cases supporting this viewpoint. However, such a conclusion would be spurious. Although numbers of cranes and kites have increased dramatically on a percentage basis over the past few years, their ranges remain so restricted and/or their habitats so specialized that a single catastrophic event could exterminate them. Similarly, the Kirtland's Warbler continues to be ex-

tremely susceptible to an unpredictable event, either on its breeding or wintering grounds. Despite concentrated major efforts on its behalf, this species has not increased in numbers over the past 15 years. In short, the increased or stabilized numbers of these three populations probably should be viewed as no more than minor interludes on a time-numbers chart; the birds are almost as vulnerable to environmental perturbation as when their respective numbers were at their lowest.

4. General lessons

What general lessons do species such as the Ivory-billed Woodpecker and/or Kirtland's Warbler provide? (1) Species with specialized habitat requirements often are incapable of altering this behavior. (2) Habitat loss thus leads inevitably to decreased numbers. (3) The decreased numbers are likely to be accompanied by fragmentation into small populations. Once the small populations start being extinguished, recolonization of their sites is so infrequent that geographic range contracts. (4) Restriction of geographic range to one or a few sites leaves a species particularly vulnerable to extinction from environmental stochasticity. (5) Thus, once a severe decline in numbers owing to habitat loss begins, it can accelerate and quickly lead to extinction. (6) Low numbers of specialized individuals are highly vulnerable to new ecological factors, and such factors are often unpredictable. Who would have thought the Brown-headed Cowbird eventually would threaten the Kirtland's Warbler with extinction, or that the Barred Owl would expand its range sufficiently to overlap that of the Spotted Owl? (7) Once a species is reduced in numbers to some low point, its continued existence becomes increasingly precarious and large scale human intervention, often expensive, is required to prevent extinction (e.g., Kirtland's Warbler, Whooping Crane). Even so, such programs may be unsuccessful (e.g., Heath Hen, California Condor).

Although all of the species' scenarios we have discussed above have points in common with and points in which they differ from the case of the Spotted Owl, the two species that stand out as the most instructive are the Ivory-billed and Red-cockaded Woodpeckers. In each case the bird has (or had) a broad geographic range but is (or was) restricted to old-growth forest. Such forest was originally widespread throughout the bird's range, but was reduced in extent, becoming increasingly patchy. The Ivory-billed Woodpecker was eventually reduced to just one restricted population and the elimination of that population constituted extinction. The Red-cockaded Woodpecker is in the process of being reduced to small and increasingly isolated populations. Little imagination is required to see either the Red-cockaded Woodpecker or the Spotted Owl's [sic] following a tragic trajectory similar to that of the Ivory-billed Woodpecker. Because this owl seems so highly dependent on old-growth forest in most of the area with which this report is concerned, because its reproductive rates are so low and variable, and because established adults are extremely sedentary, the possibility of its extinction as its habitat is further reduced must be taken seriously. The range of the Spotted Owl is still large, a circumstance making it appear that this bird is immune to the sort of catastrophe that ultimately befell the Heath Hen. But the Heath Hen, and, more analogously, the Ivory-billed Woodpecker once had large, continuous ranges and each of these was eventually eroded to a point where only a single, narrowly distributed population remained.

With these concerns founded on the fates of several North American bird species in mind, we urge conservatism and additional research (see VI.B) in development of management schemes for the Spotted Owl. The key point to be gained by review of the fates of other specialized North American bird species is that a conservative approach is essential. Currently available options must not be foreclosed. In particular, if the number of owls is reduced below some as yet undetermined minimum, extinction

might ensue so quickly that no action could stop it.

*Id.* at 24–25.

The report offers the following recommendations:

Most of the remaining habitat suitable for Spotted Owls in Oregon, Washington, northwest California, and the Sierra Nevada is on public land administered by several agencies, primarily the Forest Service. The management plan being developed by this agency will inevitably involve a reduction in habitat available for these owls as timber harvesting proceeds. The specialized habitat requirements of the Spotted Owl, which extensively involve old-growth Douglas-fir in northwest California and the Pacific Northwest, will undoubtedly make a decline in the population of this bird a prominent consequence of this reduction. Depending on the management alternative adopted, this could involve over half of the Spotted Owls currently living in this area. Such a conscious decision for population reduction to a critical level in a non pest species must surely be unique in the history of wildlife management. The current population of Spotted Owls in California, Oregon, and Washington already is as low or lower than some of the species or subspecies considered by the USFWS to be endangered. Historically, population declines and/or extinctions of North American birds precipitated by human actions have been based on ignorance of one sort or another. However, in this case a considered judgment of a federal agency could begin or accelerate an irreversible decline in the Spotted Owl in northern California, Oregon, and Washington. We caution that more may be involved here than the maintenance of a viable population of a single species of vertebrate. The role of the Spotted Owl as an indicator of the condition and extent of old-growth Douglas-fir forest inevitably links its status with that of some basic relationships concerning energy capture and nutrient recycling within old-growth that are probably of inestimable functional importance to the overall ecology of the Pacific Northwest.

The Advisory Panel has attempted to be as risk-averse as possible in the development of its recommendations for Spotted Owls over the area of Washington, Oregon, northwest California, and the Sierra Nevada. While no recommendations can be risk-free, we do believe that ours give a reasonable chance of protecting the birds in the near term, as well as avoiding the foreclosure of options that may be needed as further information is obtained. The best prospect is the maintenance of a sufficient number of Spotted Owls over a broad enough area and it is this combination our recommendations are designed to provide.

The crucial parts of our recommendations, of course, deal with the number *and* distribution of Spotted Owls that we judge to provide a reasonable prospect for maintaining a viable population in Oregon, Washington, northwest California, and the Sierra Nevada. Nonetheless, it is vital that we also offer guidelines concerning implementation of any management plan and the research needed to put management of the owls on the firmest basis possible. We therefore put forward our recommendations organized into three categories reflecting these conditions.

B. Recommendations Concerning Numbers, Home Ranges, and Distribution of Spotted Owls

(1) *The management program for Spotted Owls in Oregon, Washington, northwest California, and the Sierra Nevada should be directed to maintenance of a minimum total of 1500 pairs of these birds* (see III.C–E). This number is based on recent surveys indicating a *confirmed* population for this overall area of approximately 2000 pairs of Spotted Owls. The Advisory Panel believes that 1500 pairs is an absolute minimum for providing any prospect for long-term survival of the Spotted Owl in northwest California, the Sierra Nevada, and the Pacific Northwest. We are marginally comfortable with this number (which is similar to those characterizing several of the birds listed in Table III.1)

only because the Spotted Owl has a widespread and relatively uniform distribution over this area, in contrast to the restricted distributions characterizing most birds currently regarded as endangered. Our numerical recommendation is thus predicated on the maintenance of this broad distribution. To put the minimum number of 1500 pairs in perspective, we must point out that it represents a decline of 25% from the presently confirmed level of 2000 pairs for the area to which our recommendation pertains. We believe that management proposals involving any smaller numbers of Spotted Owls are unrealistic and incapable of ensuring viability, especially in the absence of firm data concerning important aspects of the owl's population dynamics.

Regarding implementation of this recommendation, we assume that responsibility for maintenance and monitoring of the local populations of Spotted Owls must involve a broad spectrum of federal, state, and private organizations. The Forest Service manifestly will have to assume the lead role in these activities, by virtue of the extensive areas of habitat contained in the national forests. However, the Bureau of Land Management will also have a particularly vital role to play. Indeed, the completion of the habitat network critical to sustaining a proper distribution of the owls is heavily dependent on BLM lands in Oregon.

(2) *Current geographic distribution of the Spotted Owls in Oregon, Washington, northwest California, and the Sierra Nevada should be maintained through a habitat network system like that under development by the Forest Service and cooperating agencies* (see III.D–E., IV., V.B., V.D.). As noted above, this recommendation is inseparable from that specifying the number of pairs of owls. All habitat management areas targeted for the network must have specific map locations that are readily identifiable by the public. The need is to provide *immediately* for a sufficient number of breeding pairs of owls. Because the present network system includes many habitat areas that are

unoccupied by Spotted Owls, an equal number of "interim" home ranges with known breeding pairs should be added to the network until the areas originally included in the network plan are shown to contain breeding pairs. These interim home ranges should be compatible with the dispersal guidelines used to develop the network. To assure that the network is fully integrated, it is especially important that the segment of it on lands administered by the Bureau of Land Management between the Coast Range and the Cascades in Oregon be included. It is equally critical that all existing home ranges in the Shasta County, California, portions of the Shasta and Lassen National Forests be protected to sustain the linkage across State Highway 299 between the Sierran and northwest California segments of the Spotted Owl population with which we are concerned. Acquisition of private land containing active home ranges in this care could significantly contribute to maintenance of this linkage.

(3) *The view that an effective breeding population of 500 always suffices to maintain sufficient genetic variability for subsequent evolution in a changing environment should be discarded from management formulations* (see III.D). As we note in this report (III.D.1), the value of 500 for effective population size ($N_e$) rests on a poor model applied to one trait in fruit flies. No particular value of $N_e$ can guarantee adequate genetic variability against all environmental contingencies. Moreover, one cannot specify the probability that sufficient genes will exist in a population of particular size without defining the magnitude and nature of the changes confronting it. Unfortunately, these changes cannot be forecast. Therefore all one can say is that the species may be endangered by insufficient genetic variability and that there are fewer alleles, other things being equal, in small populations than in large ones. The Advisory Panel believes that adverse developments for the Spotted Owl arising from demographic and environmental stochasticity are more im-

mediate concerns than loss of heterozygosity and possible inbreeding depression.

(4) *Habitat areas that include 4500 acres (1823 ha) of old-growth forest should be retained for pairs of Spotted Owls in the Washington portion of the network. Habitat areas for accommodating pairs in Oregon and northwest California should provide 2500 acres (1013 ha) of old-growth. On the basis of preliminary information, we recommend that the figure for old-growth in the home ranges of pairs of Spotted Owls in the Sierra Nevada be 1400 acres (567 ha).* (See IV.) Because certain home ranges with less than the prescribed area of old-growth forest are known to support breeding pairs of Spotted Owls, deviations from the prescription may be allowed, contingent on adequate documentation and approval of a standing committee of experts, the majority of which is drawn from neither the agency involved nor industry. Relaxation of these prescriptions concerning habitat areas should be permitted only if research establishes unquestionably the safety of such an action.

*Id.* at 31–33 (emphasis in original).

4. *An analysis of the population demographics of the spotted owl by Dr. Russell Lande (1985 and 1987)*

In 1985, Dr. Russell Lande released a scientific review of the population demographics of the spotted owl. Population demographics are important because they are the only means of looking at the species as a whole rather than looking at what happens to individual pairs of owls.

Dr. Lande's study in 1985 was specifically directed at owl populations on Forest Service lands. Dr. Lande's report evaluated the likely effect of the Spotted Owl Management Plan proposed by the United States Forest Service for maintaining viable owl populations. Dr. Lande asserts in his report that the low juvenile survivorship of spotted owls may result in serious danger of extinction of the owls as a species in the near future.

Dr. Lande explained that young spotted owls are fledged in the summer and disperse long distances in the fall (dozens of kilometers). Dr. Lande states that under primitive conditions, before historical settlement of the Pacific Northwest by white men, roughly sixty to seventy percent of the forest consisted of old-growth forests, with the remaining area in younger categories due to fire and other natural disasters.

Dr. Lande notes that under the Forest Service Management Plan, described in the Regional Guide for the Pacific Northwest Region (1984), habitable territories for the spotted owl would comprise about six percent of the total forested area in the affected national forests. Dr. Lande concludes that it may not be easy for juvenile spotted owls to find habitable territory in such circumstances. Dr. Lande concludes:

The Forest Service SOMP [Spotted Owl Management Plan] is based mainly on genetic considerations, which suggest that an effective population size of 500 is the minimum necessary to ensure the genetic variability required for adaptability and long-term survival of the population. However, as explained above, demographic analysis appears to be of primary importance for management of the northern spotted owl.

For spotted owls the effective population size is about half the actual population size, mainly because of the large variance in reproductive success among individuals (Barrowclough and Coats, 1985). In planning for 500 SOMAs the Forest Service plan would meet the objective of an effective population size of 500, if every SOMA were always occupied by a breeding pair. However, a substantial fraction of habitable territories are now unoccupied. The SOMP fails to account for the expected decrease in the occupancy of habitable territories at demographic equilibrium caused by increasing the average distance between habitable territories. This increases the risk of death for dispersing juveniles, which should not be assumed to be perfectly capable of searching out and finding rare habitable territory.

An effective population size of 500 is probably about the minimum necessary to ensure normal amounts of genetic variability in most characters, and adequate adaptability to changing environmental conditions, although it does not provide much of a safety factor (see Lande and Barrowclough, 1985). It should be stated that the documents from which the Forest Service drew this number are all based on a paper by Franklin (1980) which is predicated on the (admittedly) unrealistic assumption that natural selection is absent. Franklin's number was itself derived from limited data on the maintenance of genetic variability by spontaneous mutation compiled by Lande (1976), and Franklin, aware of the limited data base and the simplistic nature of his derivation, was duly cautious about suggesting it. Although more thorough analysis has confirmed Franklin's number as being about the right order of magnitude (Lande and Barrowclough, 1985) it should be emphasized that there is still substantial scientific uncertainty in it.

On genetic grounds alone it would be possible to argue that the effective population size necessary to ensure long-term viability is considerably larger than 500, due to scientific uncertainty regarding the various parameters entering into its derivation. In view of the substantial scientific uncertainties involved, the practice of managing rare populations down to the minimum size recommended by experts (without a substantial safety factor added) is probably dangerous to their survival, especially when, as in the present case, little allowance has been made for possible demographic problems.

### V. Conclusion

From the available information on the life history and demographic characteristics of the northern spotted owl, I conclude that under current conditions the population of the spotted owl may already be declining and in danger of extinction within the next century. Further habitat alteration, as planned by the U.S. Forest Service, is very likely to cause the extinction of the spotted owl

from the management area on a shorter time-scale.

Report on the Demography and Survival of the Northern Spotted Owl, pp. 24–26.

5. *An analysis of the spotted owl prepared by a team of BLM's biologists (May 8, 1986 and January 16, 1987)*

On May 8, 1986, the BLM issued its own "Northern Spotted Owl Analysis." This analysis reported, in part:

> The Bureau is harvesting 200 year old and greater forests at the average rate of 15,000 acres per year. At this rate the old-growth will be gone from the Salem, Eugene, and Coos Bay Districts in 20 years, the Roseburg District in 30 years, and Medford in 40 years. In California, at current harvest levels, it is estimated old-growth forests will be depleted in 20 years.
>
> . . . .
>
> Federal agencies manage 4,700,000 acres of old-growth forest land (95 percent). Therefore, any action taken by Federal land managers has a large impact on the spotted owl habitat. Conversely, private, state, and tribal actions have very little.
>
> . . . .
>
> In Oregon, Bureau interim protection measures resulted in identification and interim establishment of 90 spotted owl management areas (SOMAs). Seventy nine SOMAs are located in older forest retention and other set-aside areas, and the remaining 11 are temporarily being protected outside of . . . these retention areas, without reducing allowable cuts. Based on Oregon Department of Fish and Wildlife analysis in 1985, of the 90 SOMAs, they found the average SOMA contains 800 acres of older forest type, and range in size from 24 to 1,311 acres of this type.
>
> . . . .
>
> B. *Population*
> The spotted owl currently remains widely distributed in suitable habitat throughout its recent historical range. The best population estimate is that 1,500 to 2,500 occupied spotted owl

sites exist within the species range. Available evidence indicates that the population is declining throughout its present range in Washington, Oregon and California. No owl population trend data is available for British Columbia. Inventory and monitoring data suggest a range of one to four percent annual population decline that varies by state. However, the data is weak on this subject due to annual differences in inventory and monitoring efforts. The major factor in this decline is fragmentation of habitat due to timber harvesting.... There is no evidence that indicate[s] biological factors, i.e., disease, adult mortality or predation, are exhibiting any major unnatural impact on the survival of spotted owls.

Cumulative inventory and monitoring records that have been compiled on the spotted owl population during the last 10 years may have left the false impression that the owl population is stable to increasing. However, several factors must be considered; (1) new owl sites are being found but no new habitat is being created, (2) owls often just shift to adjacent habitat or disappear after logging, (3) adult owls appear to have a low mortality rate, (4) sites where owls were once located often remain on monitoring records long after the habitat is removed, (5) adult owls may remain in their habitat area long after logging has eliminated suitable habitat (site tenacity).

Data is lacking on the demography (life expectancy, reproductive age, survivorship, age structure, longevity, population trend, age at first breeding) of spotted owls due to the short time frame which research has been directed at answering these questions. It is known that there is a high annual fluctuation in the percent of the population that breeds. In Oregon, a high percent of breeding failures were reported during the following years[:] 1982, 1984, and 1985. Documented nesting success of spotted owls has ranged from 16 to 89 percent in Oregon and 0 to 45 percent in California. It is suspected that prey abundance and availability may have an important relationship between spotted owl habitat selection and reproductive success. Ongoing research being conducted through the Old–Growth Forest Wildlife Habitat Program, Pacific Northwest Forest and Range Experiment Station may provide a better insight into the relationship between the fluctuations in spotted owl reproduction and prey availability.

During the years 1982–1985 over 100 juvenile spotted owls have been tracked, using radio telemetry techniques in Oregon, Washington, and California, Juvenile owl mortality has approached 100 percent during the last three years of dispersal studies. It has not been determined if any of the young owls were recruited into the adult breeding population. Most of the owls died or were lost during the studies making it virtually impossible to document meaningful juvenile survival rates. However, it is estimated that current juvenile survivalship is below the level needed to maintain a stable population. The dispersal studies have contributed valuable information on juvenile dispersal. Research has shown that juvenile owl dispersal is random in direction and ranges up to 62 miles with the average distance in the 15 to 28 mile range. The research findings and other general observations of juvenile owls have shown that they frequently cross open habitats to reach blocks of mature and old-growth forests. The young owls do not seem to select any particular habitat types in these open areas for roosting and foraging and frequently succumb to predation and starvation. The open habitats may be effective barriers to dispersal and the owls' use of these areas may contribute to the high mortality rate. There is speculation that radio transmitters placed on juvenile owls may be a cause of mortality. This subject needs further research.

Mammals, and particularly flying squirrels, woodrats, red tree voles and deer mice, comprise the highest percentage of the spotted owls' prey base. All the species were found to use old-growth Douglas-fir/western hemlock forests for optimum breeding and foraging habitat. Woodrats, red tree voles and deer mice were found to exhibit strong association with old-growth Douglas-fir stands in northwestern California. Research on spotted owls indicates that breeding success is the best measure of habitat quality and that breeding success is highest during periods when there is a high percentage of large prey (woodrats and flying squirrels) in the owls' diet. A research project was begun during 1986, in southwestern Oregon that is directed at determining why spotted owls show a strong preference for old-growth forests over younger stands. The study will investigate the distribution of spotted owls' prey species and how this distribution influences the owls' foraging strategy.

Timber harvesting is increasing forest habitat fragmentation (creating open habitat) and altering forest structure which in turn favors the emigration of both great horned and barred owls. Great horned owls and goshawks are known to occur within the home ranges of spotted owls and may prey on both adults and juvenile owls. Documented predation on spotted owls is limited to a few kills of juveniles by great horned owls. The density of great horned owls, red-tailed hawks and goshawks appear to increase as the habitat is opened by logging which has the effect of concentrating these raptors in the remaining old-growth stands. The concentration of raptors often leads to interspecific conflicts and predation. Predation is a natural mortality function in life cycles and is not usually a significant factor in population declines unless a population is already below the threshold level. Many other birds interact with the spotted owl, these include ravens, Cooper's hawks, scrub jays and other smaller forest birds.

There is no evidence that spotted owls are disturbed by most of man's activities in the forest, except logging....

....

D. *Analysis*

Since 1800 the area of old-growth forest type within the range [of] the spotted owl has declined from 15,000,000 acres to 4,972,000 acres. Of this remaining acreage 57,000 acres per year is being harvested from federal lands. In Oregon, 77 percent of the suitable spotted owl habitat on non-federal land was harvested between 1961 and 1985. During this same period spotted owl habitat in Washington was reduced 81%. If these trends continue, the non-Federal habitat will be gone in Washington in 1988 and gone in Oregon in 1989.

BLM currently has 683,450 acres of old-growth (196 + years), 12% of the total available in the area of spotted owl occurrence, 352,154 acres of this is available for harvest. At the current harvest rate, 17,000 acres per year, all of the old-growth subject to harvest will have been depleted by the end of four decades. This rate of habitat decline corresponds closely with the estimated rate of spotted owl population decline. However, all of the remaining old-growth forest type on BLM land is not suitable habitat. Most is fragmented into small blocks, other areas classified as old-growth have been selectively harvested to reduce tree density, and other areas do not have necessary habitat characteristics for spotted owl.

As timber in suitable habitat areas is harvested there will be increasing fragmentation. This will cause habitat loss at a much greater rate than the actual reduction in old-growth forest acreage. There are suggestions that if current cutting levels continue for the next four years the BLM will no longer have the options of providing: (1) additional spotted owl management areas

(SOMAs); (2) habitat corridors between key population segments; and (3) multiple owl SOMAs. BLM lands in the coast range provide crucial links between USFS lands in the Coast and Cascade ranges. Without the above options the spotted owl populations in the coast ranges of Oregon and California may be genetically isolated from the primary population in the Cascades. It has been suggested that all of these population segments have to be maintained and linked in order to have a self sustaining breeding population.

E. *Findings*

From this analysis there are several relationships and conclusions that can be made.

1. Spotted owls pairs use large amounts of old-growth forest type (average is 2200 acres) in their home range.

2. This habitat type is being reduced and fragmented.

3. Major prey species are highly associated with old-growth forest.

4. Fragmentation results in larger home range.

5. Larger home range and reduced prey base requires a greater expenditure of energy for foraging.

6. Higher energy expenditures result in lower nesting success.

7. Juvenile mortality approaches 100% in fragmented old-growth forest type.

8. Spotted owls show a strong preference for old-growth forest.

9. There is no evidence that anything other than habitat loss is affecting spotted owl populations.

10. Habitat loss and deterioration is associated with the following:

— increased habitat for predators and competing species

— decreased availability of prey species

— increased susceptibility and potential for higher mortality

— reduced nesting success

— reduced thermal cover

Northern Spotted Owl Analysis, pp. 8–20.

On January 16, 1987, the BLM issued a second document entitled "Draft Northern Spotted Owl Analysis," which contains the following findings:

From our review of existing information, we conclude:

— Spotted owl and old-growth forest management is a complex resource management issue, involving biological, economic, and legal considerations.

— Spotted owl populations are declining throughout their range.

— While there is some evidence the spotted owl is being displaced in some locations by the barred owl; and predators, such as the great horned owl, are reducing spotted owl populations in some areas; in the main, the evidence indicates spotted owl decline is related to habitat loss and fragmentation of that habitat.

— The scattered nature and amount of BLM old-growth forest lands indicate actions BLM takes to maintain the spotted owl should be done in consort with other landowners. Other agency land management actions may have a greater impact on maintenance of spotted owl populations, than will Bureau actions.

Bureau lands may provide links between owl populations in the Coast and Cascade ranges, in northern California, and between Bureau lands and other ownerships. The site-or area-specific relationships of these linkages is unclear.

— There is a wide-ranging amount of research, study and monitoring information, presently available, related to the northern spotted owl. While these efforts are continuing, there are areas where information is lacking.

— Research, studies and monitoring, no matter how extensive, will probably never be conclusive; however, the Bureau should decide on a policy based on existing knowledge.

Draft Northern Spotted Owl Analysis, pp. v-vi.

On May 8, 1987, the BLM issued a third analysis entitled "Northern Spotted Owl Analysis, Bureau of Land Management." This document is essentially the same as the January 16, 1987 document, but contains the following Executive Summary:

### Northern Spotted Owl Analysis
### Executive Summary

This summary highlights the significant information from the analysis of the northern spotted owl on Bureau of Land Management lands in the Pacific Northwest prepared by an interdisciplinary team of Bureau specialists. In addition to containing more detailed information on these summary topics, the analysis includes material not found in this summary.

*The Assignment*

In March 1986, the Bureau of Land Management appointed a team of specialists to review the status of the northern spotted owl on BLM lands in western Oregon and Washington, and in northern California. The team was to identify key questions of concern to Bureau managers; to review the existing scientific information about the owl; and identify gaps in that information and where uncertainty exists. Current research, studies and monitoring related to the biology of the owl and its associated habitat were to be reviewed, and no new studies were to be initiated. Current Bureau policies and procedures were to be identified; legal aspects of six statutes were to be analyzed by the Department's Solicitor's Office; and the economic and community stability implications of spotted owl management were to be examined.

*The Biological Situation*

The northern spotted owl occurs in the forested areas of southwestern British Columbia, western Washington, western Oregon and northwestern California. Information from research, inventories, and monitoring programs indicates that the population may be declining in the region from one to four percent annually. Spotted owls show a strong preference for old-growth and use mature forest types in their daily and yearlong activi-

ties. In Oregon, research indicates home ranges include an average of 2,200 acres of old-growth forest and in Washington the average is nearly 5,000 acres. Research findings indicate that old-growth forests provide conditions for the optimum number of spotted owl prey species. In addition, they provide conditions that make prey available, cavities suitable for nesting, thermal cover, and protection from predators.

Loss of old-growth forest and forest fragmentation appear to be the major contributors to spotted owl population declines. Forest fragmentation results in larger home ranges, greater expenditure of energy for foraging, decreased probability that dispersing juvenile spotted owls will locate suitable habitat, and habitat loss and unsuitability at a greater rate than the actual reduction in old-growth/mature forest acreage.

Habitat managed by BLM may play a crucial role in maintaining genetic links between habitat areas and sustaining a proper distribution of owls throughout their historical range.

. . . .

At the current rate of harvest of both old-growth and mature forests on BLM lands in the region, nearly 592,000 acres subject to harvest will remain standing at the end of 1990. Coupled with the 248,500 acres of old-growth/mature forest lands already withdrawn from timber harvest, a total of about 840,000 acres will remain standing at the end of 1990. If there are no BLM forest land use plan changes in western Oregon, and harvest levels of old-growth/mature forests remain at the present levels, the old-growth/mature habitat subject to harvest will be depleted in approximately 25–30 years. The 248,000 withdrawn acres of old-growth/mature forests, however, would remain. There would also be additional acres of mature forest due to the growth of present 70, 80, and 90 year old stands.

Although uncertainties exist throughout the information base on spotted owls, many credible scientific findings are in-

cluded in the growing literature base. Over twenty study/research projects are currently underway on spotted owl biology and habitat requirements in the States of Oregon, Washington and California. Findings from many of these research efforts should be available for reference in the next five years while others may not be available in the long-term—10 years. There is sufficient information now documenting that if planned timber harvest continues, further decline of the owl population on BLM lands will occur. Additional research is needed for making decisions on maintaining individual owl sites and population viability.

The U.S. Forest Service's 1987 budget allocates $1.5 million dollars for new spotted owl research which will allow investigation of areas where the existing information base on the spotted owl is deficient. In addition, their budget provides for $1 million dollars for spotted owl monitoring.

*Economic and Community Stability Considerations*

Withdrawing 1,200 acres of commercial forest land for a spotted owl management area (SOMA) would result in foregoing net timber income annually ranging from a high of $112,800 in the Coos Bay District to a low of $40,800 in the Medford District. If the SOMA were expanded to 2,200 acres, the net timber income foregone annually would be approximately 83% greater than that with 1,200 acres.

Withdrawal of a 1,200 acre SOMA in western Oregon would result in a reduction of an average of 21 jobs. Reduction in jobs per 1,200 acres withdrawn from the allowable cut ranges from a high of 28 jobs in Coos Bay to a low of 12 jobs in Medford. These would be jobs directly related to timber harvest and processing, BLM jobs, and those indirectly related to the forest products industry (e.g. retail stores, restaurants). The economic impact on communities would vary depending upon the number, size, and timber productivity of SOMAs withdrawn and the relative dependency of the communities on the forest products industry.

. . . .

*Management Concerns*

The key issue in the BLM decision to harvest or not harvest the remaining old-growth/mature timber is the uncertainty of the effect of this decision on the overall viability of the owl population. While the significance of BLM lands in maintaining genetic links between other owl populations and population viability is not well known, research on other species and the accepted principles of island biogeography suggest that these lands may provide a critical link.

There are a number of land management options ranging from no harvest to unconstrained harvest of spotted owl habitat. If suitable spotted owl habitat is not harvested, this preserves maximum options for managing owl habitat. In the future, if it is determined that BLM forest lands are not critical to the overall viability of the owl population, those lands could be harvested. However, timber income and jobs would have to be foregone, at least in the short term.

If suitable spotted owl habitat is harvested at the planned rate, an irreversible decision, there is a risk of losing future options for managing owl habitat. If, in the future BLM lands are determined to be not critical, then harvesting the timber would be a net gain because timber production, income and jobs would not have been foregone.

Federal listing of the spotted owl as threatened or endangered, and/or legal interpretation of the O & C Act would modify any options chosen.

Northern Spotted Owl Analysis, Bureau of Land Management, pp. i-iv.

THE HEARING

In addition to the documentary evidence presented, this court held an extensive evidentiary hearing in which evidence was presented by all parties as to the accuracy of the new information and the conclusions drawn from it.

The Portland Audubon Society presented the testimony of three scientists who testified as to the current state of knowledge and the danger of extinction of the spotted owl: Dr. Gordon Orians, Dr. Russell Lande, and Alan Franklin.

Dr. Orians, a professor of zoology and environmental studies at the University of Washington, testified that he has reviewed the BLM's Spotted Owl Environmental Assessment dated February 3, 1987, and there is no biological basis for the assertion in the Spotted Owl Environmental Assessment that old-growth forest logging will not adversely affect the spotted owl so long as more than 1,300 acres of owl habitat is maintained in each spotted owl site. Dr. Orians testified that the logging of the habitat of the spotted owl as proposed increases the risk of extinction of the spotted owl because logging fragments the spotted owl's habitat.

According to Dr. Orians, fragmentation of the old-growth habitat of the spotted owl poses the greatest threat to the spotted owl's survival as a species because as habitat declines, the spotted owl finds it increasingly difficult to reproduce. This is due to a high juvenile owl mortality during dispersal, increased difficulty in finding vacant breeding territories, and declining breeding success associated with increased energy expenditures in searching for food in the more fragmented environments.

The Portland Audubon Society also presented the testimony of Dr. Russell Lande. Dr. Lande testified that preserving essentially all of the remaining spotted owl habitat is necessary to protect the long-term viability of the spotted owl. Dr. Lande testified that the Spotted Owl Environmental Assessment and the district-wide Environmental Impact Statements were based on the fundamental error that the spotted owl's survival would be assured by protecting discrete "islands" of habitat in a "sea" of clearcuts and tree farms. According to Dr. Lande, territorial habitat specialists such as the spotted owl generally become extinct long before all of their habitat is lost because territoriality sets a limit on population densities and as the remaining habitat becomes more fragmented through destruction, dispersing juvenile owls find it increasingly difficult to find existing vacant territories. At some point, well before the complete loss of territories, the rate of recolonization declines faster than the rate territories are vacated due to the death of the residents, thereby leading to the extinction of the population.

Dr. Lande's analysis utilizes the concept of a metapopulation (a large population made up of many smaller units) maintained by a balance between local extinction and colonization. On the assumption that territories are randomly or evenly distributed across the region, Dr. Lande's model, as presented in his 1988 article, predicts the effect of future habitat loss on the occupancy of territories. Dr. Lande concludes that the vast majority of the remaining old-growth forest must be preserved in order for the population of the spotted owl to remain viable.

Dr. Lande testified that his analysis was optimistic in several important respects. He assumed that there was no difficulty in spotted owls finding mates, no dispersal of juveniles out of regions containing old-growth timber, no demographic or environmental catastrophes, and no loss of fitness due to inbreeding in small populations. In addition, Dr. Lande assumed that the spotted owl territories designated to be protected by government agencies would, in fact, support spotted owl pairs in the future. Dr. Lande testified that violation of any of these assumptions would make population viability more difficult.

To summarize, in Dr. Lande's opinion, all of the remaining spotted owl habitat must be protected in order to assure with reasonable probability the long-term survival of the spotted owl. Dr. Lande knows of no scientific basis for concluding that further habitat loss will not jeopardize the survival of the spotted owl. Dr. Lande contends that all available evidence is to the contrary.

Finally, the Portland Audubon Society presented the testimony of Alan Franklin, a wildlife scientist with extensive familiarity and experience working with the spotted

owl. Franklin testified that clearcut and shelterwood logging (even-aged silviculture) of forests which provide habitat for the spotted owl threatens the survival of the species, and that even-aged silviculture adversely affects the spotted owl because it destroys nest trees and core areas—the areas of primary use by spotted owl pairs; it destroys foraging habitat at a particular site suitable for use by a breeding pair of spotted owls which leads to the decreased availability of prey and the need for increased energy expenditures by spotted owls for foraging thereby causing reduced breeding success; it causes fragmentation of the spotted owl's habitat across the landscape which leads to the increased risk of juvenile dispersal mortality due to increased predation and starvation; and it causes reduced density of breeding sites across the landscape which leads to reduced site occupancy.

Franklin testified that the BLM (in its Spotted Owl Environmental Assessment, timber sale assessments, district-wide Environmental Impact Statements and wildlife biologists' testimony) addresses only the first two of these effects—core area and foraging habitat loss at a particular spotted owl site. Franklin contends that the BLM fails to address the major threats to the spotted owls' survival as a species—that is, fragmentation of habitat and reduced density of breeding sites across the landscape.

Franklin explained that spotted owls are a territorial species. Each breeding pair of spotted owls occupies a "site" of several thousand acres in size. A spotted owl pair may occupy a site for up to a decade or more. Young spotted owls, having fledged, disperse from their natal site to search for a vacant site to colonize. For most of the spotted owls' evolutionary history, spotted owl sites were contiguous across the landscape, generally uninterrupted by open areas or younger forests. Young spotted owls enjoyed relative security during dispersal because much of their dispersal was through older forests where prey was available and predators infrequent.

Franklin concluded that logging has greatly changed the spotted owl's environment during the last 100 years. He contends that today's forest is a patchwork quilt of stands of old forest mixed with fresh clearcuts, young plantations and intensively-managed tree farms—that is, fragmented remnants of the previously contiguous old forest. Fragmentation of the spotted owl's habitat is not the result of one large "timber sale," says Franklin, but the result of many small logging operations. Any one of those harvests may appear insignificant, but has the effect of threatening the spotted owl's survival as a species, concludes Franklin.

The BLM presented the testimony of a number of BLM employees regarding the specifics of the five 1988 timber sales enjoined and the effects of the proposed injunction on the timber management plans of the seven districts. The BLM relies upon the testimony of William Neitro, a BLM wildlife biologist, who testified, in part, as follows:

BLM signed an Agreement with ODFW [Oregon Department of Fish and Wildlife] in 1983 to maintain the habitat for 90 pairs of spotted owls. Monitoring data collected by BLM between 1983 and 1986 indicated that the pair occupancy rate of the 90 sites ranged between 67–72 percent.

In late 1987, ODFW expressed their concern that the 90 spotted owl sites were not adequately occupied by owls and reported that occupancy of paired owls was not satisfactory. The ODFW Director proposed to BLM that at least 110 spotted owl sites should be managed by BLM to assure the maintenance of sufficient habitat for 90 pairs of owls. The BLM State Director agreed to the proposal and charged BLM biologists and area managers to meet with ODFW biologists and to work out a site selection process. Several meetings were held between the biologists of each agency that resulted in three sets of criteria to be used to guide spotted owl site selection: Occupancy, distribution and size of site (acres). Each criteri[on] was deemed of equal importance although within each major cri-

teri[on] priority conditions in descending order were established as follows:

*Occupancy*

1. Occupied by a pair of owls.
2. Occupied by a single owl.
3. Site recently occupied but present status unknown.
4. Historically occupied but not now.

*Distribution*

1. Even distribution is most desirable.
2. East-west connection must be maintained.
3. North-south connection with USFA in Coast Range[.]
4. Extension of range in north coast is desirable.

*Size of Spotted Owl Area*

1. Home range determined by telemetry data.
2. 2,200 acres of mature and old growth within 1.5 mile radius.
3. 2,200 acres of mature and old growth within 2.1 mile radius.
4. Best available habitat in actual use.

Thus under the occupancy criteri[on], [a] site occupied by a pair of owls would be selected over a site occupied by a single owl. The initial site selection group agreed on the following broad selection assumptions:

(a) Lower quality habitat was acceptable in the Salem District because the sites are essential to distribution.

(b) Spotted owl viability cannot be met on BLM lands alone.

(c) BLM and the Forest Service have an opportunity to share management of some spotted owl areas.

(d) The habitat quality of the sites not selected is lower.

(e) The spotted owl population on the north coast is isolated from the remainder of the Oregon population. Sites were selected there to meet the long term goal of recovery.

(f) East-west habitat connectors are essential and the Eugene District needs additional sites in the long term.

The initial selection of the 110 sites was made by BLM and ODFW biologists with critical review by BLM area managers. Each selected site was closely reviewed by ODFW biologists to determine how it rated with the selection criteria, occupancy, distribution, and size of area. The ODFW biologists also selected owl sites that did not overlap with adjacent owls, sites that were not located in protected (withdrawn) areas, and sites that could become future links to isolated habitat. In the final selection of spotted owl sites to be maintained by BLM through year 1990, one hundred and eight (108) of the 110 sites were occupied by pairs in the last two years (1986 and 1987). The State Director of BLM and the Director of ODFW signed the new Spotted Owl Management Agreement on December 22, 1987. (See attached map.)

In Oregon, the BLM lands provide several crucial links for spotted owl habitat between the major landholdings of the Forest Service and links between the coast and Cascade Mountains.

The location of BLM lands in the foothills of the coast and Cascade Mountains make it feasible to maintain up to five cross valley links; one at Eugene across the Willamette Valley; one or two at Roseburg across the Umpqua Valley; and one or two across the Rogue Valley in the Medford District. BLM lands and known owl sites also provide the only connector between the Cascade Mountain Range in Oregon with potential spotted owl habitat in north central California. In the Coast Range Mountains the older forest habitat on BLM lands provide three extremely crucial linkages that are assumed to be required to maintain self-sustaining populations of northern spotted owls in the coast range. These links include spotted owl habitat located in northwestern Oregon that may provide the only future connecting habitat between Oregon and the State of Washington. Because of BLM's checkerboard land ownership pattern, it was recognized by BLM biologists in the late 1970's that to have some degree of a functioning ecosystem management strategy (that included old-growth forest habitat) on the O & C forest lands in

western Oregon would require some type of corridor or linking of blocks of older forest habitat. At this early date, potential corridors were mapped that included linkages within and between BLM districts and other major connections with adjacent Forest Service holdings. This corridor map was shared with each National Forest office where habitat linkages were feasible (Siskiyou, Siuslaw, Rogue, Umpqua, Willamette and Mount Hood Forests). At this time BLM recognized that self-sustaining populations of northern spotted owls could not be maintained exclusively on BLM lands, however, that these lands had a vital role in the maintenance of spotted owls in western Oregon, especially in the Coast Range Mountains. Thus, during the development of the 1980 land use plans several BLM districts selected spotted owl habitat (owl sites) that would provide the best distribution while also allowing for linking with owl sites identified by the Forest Service. Some joint spotted owl habitat management areas were also identified during this process. Without these crucial linkages or connectors of older forest blocks or spotted owl habitat sites, the owls located in the Coast Range could be relegated to a series of isolated populations.

Neitro offered the following comments on Dr. Orians' testimony:

(a) BLM has given special consideration to the effects of habitat fragmentation on th[e] spotted owl for over eight (8) years, beginning in early 1979 when the initial spotted owl management areas (SOMAs) were identified. It is well known that the majority of the BLM lands and spotted owl habitat sites are highly fragmented due to the basic landownership pattern. In spite of the highly fragmented habitat, spotted owl nesting (reproduction) has been documented at 168 sites during the last three years with 84 percent or 142 sites successfully producing young (Exhibit A). A total of 221 young spotted owls have been documented on BLM spotted owl sites during the last three years. The recently signed

BLM/ODFW agreement further documents BLM's concern for the selection and maintenance of the best available habitat within 2.1 miles of the core area of spotted owl sites.

(b) BLM has conducted monitoring on numerous spotted owl habitat sites ranging from 10 to 15 years. BLM's monitoring guidance was developed in 1986 and requires seven (7) visits to each owl site to determine occupancy and two visits to determine reproduction. BLM District offices have been using similar monitoring techniques dating back to 1984. BLM has also expended over one (1) million dollars on spotted owl monitoring since 1983. Annually, BLM in Oregon has located more nest trees and/or reproducing owls (verified by presence of young owls) than any other agency in Oregon or Washington. During one three-year period the spotted owl nest sites/young located by BLM biologists formed the baseline data for a research project being conducted by Oregon State University on the Dispersal of Juvenile Northern Spotted Owls in the Pacific Northwest Douglas-fir Region. (Miller, 1985). The nest sites/young located by BLM were crucial to the success of this research as few to no nests were located in the region on other forest land ownerships. Between 1985 and 1987 BLM located 168 nest sites for young (indicating nesting success) on BLM lands (Exhibit A). Medford District biologists located 24 percent of these nest sites during the three-year period (Exhibit B). BLM has also collected actual habitat use data on 55 spotted owl sites during the last 5 years through the use of radio telemetry techniques. It is well documented that radio tracking is an expensive and labor intensive procedure. Habitat use data collected through radio tracking of spotted owls provides BLM managers the baseline inventory data required to assure that knowledgeable decisions can be made for spotted owl management.

Of the 289 spotted owl sites analyzed in the Spotted Owl Environmental Assessment (EA) nest sites have been documented on 108 sites and "centers of activity" or "core areas" have been identified on 146 sites. This illustrates that BLM has a high level of basic data on 87 percent of these spotted owl sites. It is my biological opinion that the knowledge of a specific "core area" or "center of activity" is of more importance for management of an owl site than the exact nest site location because new nest sites may be used each year. Collecting reproductive data on the northern spotted owls is not a low priority monitoring assignment. As stated above, occupancy and reproductive surveys are conducted numerous times at each spotted owl site. However, due to the heavy monitoring workload first priority is given to monitoring spotted owl sites included in the BLM/ODFW agreement.

It should be noted here that actual location of a nest site is not required to document reproductive success. On many occasions young owl[s] are located by the field surveyors during one of the seven occupancy or reproduction surveys (visits) thus no attempt is made to locate a specific nest site because usually new nest sites are used annually by spotted owls.

Besides the habitat use data that is being collected through use of radio telemetry techniques, BLM biologists are also banding spotted owls with U.S. Fish and Wildlife Service leg bands and colored leg bands. Between 1983 and 1987 BLM has banded 576 spotted owls (373 adults, 36 subadults, and 167 juveniles) in Oregon.

Data being collected through the banding program is beginning to add to the site specific knowledge and general biology of spotted owls on BLM lands. Data collected includes but is not limited to the following: spotted owl movements within a habitat site; site fidelity; life span; etc. This banding effort is a normal part of BLM's mid-level spotted owl monitoring program. No other agency has expended a similar level of effort at the field operations level (excluding Forest Service Research).

(c) Recently, BLM analyzed the relationship between reproducing pairs of spotted owls and the acreages of old-growth forest habitat available at the site. All spotted owl sites that produced young during the last three years (1985–1987) were included in the sample. A total of 131 reproducing sites were identified. The results of this analysis documented spotted owl reproduction in habitat sites where the amount of old-growth forest ranged from zero (0) to 6,500 acres. The median acreage of old-growth at these owl sites is 1,600 and the mode is zero (0). Out of the 131 sites where spotted owl reproduction occurred during the last three years, 81 sites or 62 percent of the sites contained less than 2,200 acres of old-growth forest and 64 sites or 49 percent contained less than 1,000 acres of old growth (Exhibit C).

The testimony of Dr. Mark Boyce, a professor of zoology and physiology at the University of Wyoming in Laramie, was submitted by defendant-intervenor Northwest Forest Resources Council. Dr. Boyce testified that Dr. Orians' declaration regarding the effects of habitat fragmentation is incomplete and therefore misleading. Dr. Boyce stated:

While Dr. Orians states that "the best analyses of the spotted owl's viability have shown that as habitat declines, due to fragmentation, the owl's population finds it increasingly difficult to replenish itself," he fails to explain that he is describing the results of assumptions built into mathematical models. While he cites to results of fragmentation which are said to create problems in replenishment of the owl population, such as high juvenile mortality, increased difficulty in finding vacant breeding territory and increased energy expenditures, he fails to observe that these factors are merely hypothesized in the models as consequences of fragmentation. To my

knowledge, there is no empirical data in existence to establish that any of these factors actually occurs as a result of increased fragmentation of habitat for the spotted owl or any other avian species.

Dr. Boyce testified that whether or not logging a particular tract of land fragments habitat depends upon the spatial relationship of that tract of land to other existing habitat. He states that it cannot automatically be said that all logging of avian habitat fragments that habitat. Dr. Boyce asserts that none of the mathematical viability models which have been developed for the spotted owl to date has sufficient statistical reliability to justify its use as the basis of a major management decision.

Dr. Boyce opined that demographic procedures do not hold much promise for viability analysis in general, especially for long-lived species such as the spotted owl. Dr. Boyce states that for many species, such as the spotted owl, adequate sample sizes cannot be obtained to calculate statistically-reliable demographic projections, and empirical data remain a better source of information for major wildlife management decisions than the viability models for the spotted owl which have been developed to date.

## APPLICABLE STANDARD

Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The burden to establish the absence of a material issue of fact for trial is on the moving party. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). This burden "may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

The burden shifts to the nonmoving party to "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553.

Summary judgment may be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When different ultimate inferences can be reached, summary judgment is not appropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136 (9th Cir.1981).

The intervenors in this case argue that discovery is required before the court rules on the Portland Audubon Society's motion for summary judgment. The discovery that intervenors say is required goes to the probable accuracy of Dr. Lande's 1985 article. The court has not relied upon this document in any material way. The court has relied primarily upon reports from the BLM, to which no discovery requests have been directed. The interests of justice weigh heavily in favor of expeditious resolution of this case.

## ANALYSIS

### *Administrative Procedures Act (APA) Review*

The BLM argues that all four claims of the Portland Audubon Society are challenges to the adequacy of the Timber Management Plans and the Environmental Impact Statements which were issued between 1979 and 1983, and that these challenges are barred by 1) laches, 2) the failure of the Portland Audubon Society to exhaust administrative remedies, and 3) principles of primary administrative jurisdiction. The Portland Audubon Society in turn explains that it is challenging the decision of April 10, 1987 of the BLM not to prepare a supplemental Environmental Im-

pact Statement, and that it is not challenging the Timber Management Plans and Environmental Impact Statements issued between 1979 and 1983. The Portland Audubon Society relies upon the provisions of the APA to support its contention that judicial review of the BLM's decision of April 10, 1987 not to prepare a supplemental Environmental Impact Statement is appropriate.

The relevant sections of the APA provide as follows:

§ 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (1977) (emphasis in original).

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . .

(D) without observance of procedure required by law.

5 U.S.C. § 706 (1977).

■ To the extent that the causes of action stated in the Portland Audubon Society's complaint seek to challenge the BLM's decision of April 10, 1987 not to prepare a supplemental Environmental Impact Statement, the court finds that that decision is a final decision within the meaning of the APA and judicial review of that decision is not barred by laches, failure to exhaust administrative remedies, or principles of primary administrative jurisdiction.

■ However, the Portland Audubon Society's claims under the Oregon & California Lands Act (OCLA), the Federal Lands Policy and Management Act (FLPMA), and the Migratory Bird Treaty Act (MBTA) present a different situation. The Portland Audubon Society's second claim for relief under the OCLA and the third claim for relief under FLPMA challenge the decision of the director of the BLM in 1983 to adopt a Forest Resources Policy Statement requiring that all lands suitable for timber production be managed for timber and wood product production, to the extent possible under the requirements of law. The Portland Audubon Society contends that this policy violates the multiple use mandates of both the OCLA and the FLPMA. In the fourth claim for relief under the MBTA, the Portland Audubon Society asserts that the predictions of the demise of the spotted owl made in the Environmental Impact Statements issued between 1979 and 1983 form the basis for a violation of the MBTA's prohibition against the killing or taking of birds.

The court finds that these claims are not directed to the BLM's decision of April 10, 1987 not to prepare a supplemental Environmental Impact Statement, but are challenges to the Timber Management Plans and the Environmental Impact Statements issued between 1979 and 1983. Those Timber Management Plans and Environmental Impact Statements were prepared for the ten-year period from 1980 until 1990, with new plans to go into effect in October, 1990. Two of those Timber Management Plans were challenged by the Portland Audubon Society shortly after they were issued, but these challenges were not pursued on appeal. Challenges under OCLA, FLPMA and the MBTA were never presented to or ruled upon by the BLM.

The court finds that the APA does not provide a basis for a challenge by the Portland Audubon Society to administrative decisions made over five years ago and upon which the BLM has operated without objection. In sum, since the Portland Audubon Society failed to pursue its claims under OCLA, FLPMA and the MBTA in a timely manner, they are not subject to this court's review under the APA.

*Merits of the NEPA Claim*

■■■ The remaining claim which is subject to review by this court under the APA is the BLM's decision not to prepare a supplemental Environmental Impact Statement. The purpose of an Environmental Impact Statement is two-fold: 1) to provide decisionmakers with enough information to assist them in deciding whether to proceed with the proposed project in light of its environmental consequences; and 2) to provide the public with information about the proposed project and with an opportunity to participate in gathering and presenting information to decisionmakers.

In *Marsh v. Oregon Natural Resources Council*, — U.S. —, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the United States Supreme Court addressed the continuing duty of an agency to review new information. The court explained:

The parties are in essential agreement concerning the standard that governs an agency's decision whether to prepare a supplemental EIS. They agree that an agency should apply a "rule of reason," and the cases they cite in support of this standard explicate this rule in the same basic terms. These cases make clear that an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made. On the other hand, and as the Government concedes, NEPA does require that agencies take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval.... Application of the "rule of reason" thus turns on the value of the new information to the still pending decisionmaking process. In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t]" the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." Cf. 42 U.S.C. § 4332(C).

— U.S. at —, 109 S.Ct. at 1859 (footnotes omitted).

The Supreme Court concluded that unless an agency's decision not to supplement an Environmental Impact Statement is arbitrary and capricious, it should not be set aside. A trial court should give deference to agency expertise when considering factual issues and matters involving the exercise of judgment. This court's review is limited to whether the decision by the BLM not to supplement the existing Environmental Impact Statement was based upon "consideration of the relevant factors and whether there has been a clear error of judgment." — U.S. at —, 109 S.Ct. at 1861, quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416,

91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971).

The Portland Audubon Society submits new information that indicates that the spotted owl is declining in number; that this decline in number is due to forest fragmentation caused by logging its habitat, old-growth trees; and that uncertainty exists about the ability of the spotted owl to survive as a species if old-growth trees are logged as planned for 1988, 1989 and 1990.

The BLM and the intervenors argue that the new information submitted by the Portland Audubon Society is speculative in nature and is not accurate. The BLM and the intervenors argue that the submission of speculative and inaccurate information about the viability of the spotted owl as a species does not require the BLM to supplement existing Environmental Impact Statements.

The BLM does not dispute that a possible threat of extinction to a species is of environmental significance. In its analysis of the spotted owl, documented in drafts dated May 8, 1986 and January 16, 1987, the BLM recognizes that the spotted owl population is declining at a rate between one percent and four percent per year and that the loss of old-growth trees and forest fragmentation are the major factors causing this population decline. These facts are confirmed by the new information relied upon by the Portland Audubon Society. The new information raises uncertainty as to the effects of future planned logging of old-growth trees upon the viability of the spotted owl population.

Based upon the new information that plans for old-growth logging may present uncertainty as to the survival of the spotted owl species, and in response to the concerns of environmentalists, including the Portland Audubon Society, the BLM conducted an investigation and issued a document entitled "Spotted Owl Assessment" dated February 3, 1987. This Spotted Owl Assessment is the basis for the Record of Decision of the state director of the BLM dated April 20, 1987 declining to issue a supplemental Spotted Owl Environmental Impact Statement. The decision not to issue a supplemental Spotted Owl Environmental Impact Statement was subsequently upheld by the Interior Board of Land Appeals in an opinion dated February 29, 1988.

The Environmental Impact Statements prepared between 1979 and 1983 do not address the issues of adequate population size or the effects of habitat fragmentation upon the long-range survival of the spotted owl species. Neither does the Spotted Owl Environmental Assessment prepared in 1987. This is a significant omission from the Spotted Owl Environmental Assessment in light of the new information available at the time it was prepared.

Since the Spotted Owl Environmental Assessment does not address the critical issues of adequate population size and the effects of habitat fragmentation upon the long-range survival of the spotted owl, the court concludes that the decision of the BLM not to supplement the Environmental Impact Statements prepared between 1979 and 1983 was arbitrary and capricious in light of the new, significant, and probably accurate information that the planned logging of spotted owl habitat raises uncertainty about the ability of the spotted owl to survive as a species.

This conclusion requires the court to address once again whether the court is precluded from reviewing this action by Section 314 of the 1988 continuing budget resolution and its reenactment in September, 1988. The BLM has a continuing duty under NEPA to consider new information. This court's power to review the BLM's compliance with this duty is limited by its statutory grant of jurisdiction from the Congress. While Section 314 does not exempt timber sales from administrative challenge, it may preclude judicial review. Section 314 provides:

The Forest Service and Bureau of Land Management are to continue to complete as expeditiously as possible development of their respective Forest Land and Resource Management Plans to meet all applicable statutory requirements. Notwithstanding the date in sec-

tion 6(c) of the NFMA (16 U.S.C. 1600), the Forest Service, and the Bureau of Land Management under separate authority, may continue the management of lands within their jurisdiction under existing land and resource management plans pending the completion of new plans. Nothing shall limit judicial review of particular activities on these lands: Provided, however, That there shall be no challenges to any existing plan on the sole basis that the plan in its entirety is outdated, or in the case of the Bureau of Land Management, solely on the basis that the plan does not incorporate information available subsequent to the completion of the existing plan: Provided further, That any and all particular activities to be carried out under existing plans may nevertheless be challenged.

Continuing Resolution, H.J. Res. 395, § 314, Pub.L. No. 100–202, 101 Stat. 1329–254, 133 Cong.Rec. H 12468 (daily ed. Dec. 21, 1987). (The above section was reenacted without change as H.R. 4867 and signed by the President on September 27, 1988, and is now found in Pub.L. No. 100–446).

In *Portland Audubon Society v. Hodel,* 866 F.2d 302 (9th Cir.1989), the Court of Appeals made the following observation of Section 314:

> The section purports in one sentence to take away the jurisdiction of the district courts to hear challenges to "existing plans", while in a following sentence providing "further that any and all particular activities to be carried out under existing plans may nevertheless be challenged."

866 F.2d at 304.

In reversing the judgment of this court and remanding the matter for further proceedings, the Court of Appeals stated:

> At a trial, both sides may be able to show that owl habitat degradation was known before or after the plan was adopted. Such proof would shed light on the "new information" problem. However, that would not answer the last "provided, however" clause of the section. That clause forces the decision

maker to decide whether the challenge is to the plan or to particular activities. That decision must be made in the first instance by the trial court.

*Id.* at 307–08.

The record in the case demonstrates that the Portland Audubon Society relies solely upon "new information" in its challenge to the BLM's decision not to issue a supplemental Environmental Impact Statement. The reports and studies relied upon by the Portland Audubon Society were published after the existing Timber Management Plans and Environmental Impact Statements were completed. The information contained in the reports and studies submitted by the Portland Audubon Society was not available prior to the completion of the existing Timber Management Plans and Environmental Impact Statements.

If Section 314 prohibited challenges to an existing Timber Management Plan solely on the basis that the plan does not incorporate information which became available after the completion of the existing plan, the analysis would end here. However, as the Court of Appeals noted, this "would not answer the last 'provided however' clause of the section," 866 F.2d at 307–08.

The BLM asserts that Section 314 precludes this action because the right to judicial review of "any and all particular activities" does not apply to the action before this court. The BLM argues that the generic manner in which the Portland Audubon Society presented its factual case as well as the significant effect of the relief sought on the ability of the BLM to continue management of its lands under the existing plans requires the court to give effect to the prohibition of Section 314. The BLM points to the affidavit of its employee detailing the consequences of permanent injunctive relief on the BLM's ability to continue management of its lands under existing plans:

> 8. The initial May 18, 1988 injunction and the subsequent June 13, 1988 injunction caused a 162 million board feet shortfall below the sustained yield allowable cut level in FY 1988 BLM western Oregon timber sales. If the injunction

were to be reinstated, this volume shortfall could not be made up by offering the FY 1988 enjoined tracts during FY 1989. Additionally, 38 million board feet (two tracts bid in FY 1987, but not awarded, and six tracts bid in FY 1988, but not awarded) have been blocked from award and harvest in FY 1989 by the May and June 1988 injunctions and would continue to be blocked if the June 13, 1988 injunction were to be reinstated.

9. Actual impact on western Oregon BLM timber sales offerings in Fiscal Years 1989 and 1990 would be greater than the long term reduction in annual sustained yield productive capacity. This is because there is less lead time available to revise annual harvest plans to substitute non-enjoined timber sale tracts for those enjoined from sale under the June 13, 1988 Court Order if that injunction were reinstated and continued. Physical and legal access as well as time needed for substitute sale preplanning and environmental analysis are factors not accounted for in developing longer term sustained yield allowable cut calculations.

10. The volume of all planned FY 1989 BLM western Oregon timber sale units that would be enjoined from sale and harvest under a reinstatement of the June 13 injunction is calculated to total 396 million board feet. Substitute tracts that meet the existing forest management plans and their respective environmental impact statements total 59 million board feet. Most of these are from sale tracts that had been planned for FY 1990. Thus, timber sale offerings in FY 1989 would be 337 million board feet short of the planned allowable cut volume.

11. As a result of moving planned FY 1990 sales into FY 1989 as substitutes for enjoined tracts, if the June 13, 1988 injunction were reinstated and continued through FY 1990, this would create a reduction of 333 million board feet below the planned FY 1990 allowable cut sale plan volume.

12. A reinstatement and continuation of the June 13, 1988 injunction over the remaining two years before the implementation of the replacement plans now in development would actually drop the allowable timber sales offerings significantly below the 1.023 billion board foot level based on a simple allowable cut recalculation. FY 1989 allowable timber sale volume would drop to 839 million board feet and FY 1990 allowable timber sales volume would come to only 843 million board feet. These levels of harvest are 29 percent and 28 percent below the levels set through public land use planning and Environmental Impact Statements developed for the existing decadal timber management plans.

Corrected Fourth Affidavit of Robert E. Metzger, pp. 5–7.

In response, the Portland Audubon Society states that its challenge is a challenge to "particular activities"—i.e. to a group of site-specific sales—and therefore is allowed under Section 314.

The legislative history of the conference committee during the 1988 reenactment of Section 314 states the intent of Congress. The conference committee report states:

The managers have agreed to language in section 314 prohibiting challenges to Forest Service and BLM land and resource management plans solely on the basis that the plan is outdated or does not incorporate new information. However, the section is not intended to preclude case-by-case timber sale appeals in site-specific instances, and ensures that judicial review of these and other particular Forest Service and BLM activities shall be available.

Congress, in the exercise of its plenary authority over federal lands, has the power to limit the availability of judicial relief under substantive or procedural statutes affecting the management of those lands. While the managers do not endorse the ready use of this Constitutionally-derived power, they consider section 314 to be a necessary short term response to those challenges that have disrupted or have the potential to disrupt new management plans and timber management activities under existing

plans while the new plans are being developed. The language in section 314 has been included to ensure the smooth transition of resource management activities and planning capability from one planning period to another, especially during the last stage of management under the existing plans. The managers note that this is particularly applicable in the current circumstances because both the Forest Service and BLM are within approximately 18 months of the completion and release of final land and resource management plans and environmental impact statements in Oregon and Washington.

H.R.Conf.Rep. 862, 100th Cong., 2d Sess. at 76 (Aug. 10, 1988).

In deciding how to apply Section 314 to the timber sales at issue, this court will give meaning to the statute as a whole and avoid rendering any part of the statute inoperative or insignificant. It is a cardinal principle of statutory construction that whenever possible statutes are to be given such effect that no clause, sentence or word is rendered superfluous, void, contradictory or insignificant. *Rockbridge v. Lincoln*, 449 F.2d 567, 571 (9th Cir.1971), citing *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

The first section of Section 314 states that "[t]he Forest Service and Bureau of Land Management ... may continue the management of lands within their jurisdiction under existing land and resource management plans pending the completion of new plans." This part of Section 314 expresses the affirmative intent of Congress as stated in the legislative history of the conference committee to prevent those kinds of disruptions to existing Timber Management Plans that preclude a smooth transition from one planning period to another. Section 314 goes on to state that "[n]othing shall limit judicial review of particular activities on these lands: Provided however, That there shall be no challenges to any existing plan ... in the case of the Bureau of Land Management, solely on the basis that the plan does not incorporate information available subsequent to the completion of the existing plan." This por-

tion of Section 314 allows judicial review of "particular activities" on BLM lands, but specifically precludes the court from reviewing challenges to timber sales made under Timber Management Plans on the basis that the Timber Management Plans do not incorporate information which became available after the completion of the Timber Management Plans.

This action is a challenge to timber sales made under Timber Management Plans adopted between 1979 and 1983 based solely upon the fact that these Timber Management Plans do not incorporate new information about spotted owls. As such, the challenge made in this case falls squarely and unambiguously within the group of challenges that Congress intended to preclude from judicial review.

The most difficult issue faced by this court is the proper application of the last portion of Section 314, which states: "Provided further, That any and all particular activities to be carried out under existing plans may nevertheless be challenged."

In the most recent enactment of Section 314, the conference committee report explains that this section "is not intended to preclude case-by-case timber sale appeals in site-specific instances, and ensures that judicial review of these and other particular Forest Service and BLM activities shall be available." This legislative history is consistent with a reasonable interpretation of Section 314 as a whole. Section 314 allows the BLM to operate under the Timber Management Plans adopted between 1979 and 1983 pending the completion of new Timber Management Plans in 1990 without judicial challenges to existing Timber Management Plans based upon claims that new information requires different action. In short, Section 314 prohibits a judicial challenge to existing Timber Management Plans, but allows a judicial challenge to particular BLM activities on a case-by-case, site-specific basis.

In this case, the Portland Audubon Society challenges the decisions made by the BLM in various Timber Management Plans to log old-growth timber based upon a

claim that the Timber Management Plans do not incorporate information *now* available regarding the effects of old-growth logging on the spotted owl species. The challenge in this case is based upon a body of scientific research relating to the spotted owl species which has been developed since the adoption of the Timber Management Plans. The Portland Audubon Society presents no new information which is site-specific to any proposed timber sale activity. The Portland Audubon Society seeks judicial review of its challenge to the decisions made by the executive branch of government in existing Timber Management Plans. It does not seek judicial review of an activity of the BLM based on site-specific new information, such as the discovery of a bald eagle nest or an archeological "find" or a blow down of timber on a particular sale location. The Portland Audubon Society's challenge cannot reasonably be characterized as a challenge to a "particular activity" for which judicial review is available under Section 314. If "particular activity" were meant to be so broad as to include the Portland Audubon Society's challenge, the statute's intent that the BLM continue under existing Timber Management Plans until new plans were completed would have no meaning. Under the facts of this case, Section 314 precludes judicial review because this case is based solely upon the claim that the Timber Management Plans do not incorporate new information available subsequent to the adoption of the plans. The facts of this case preclude it from being deemed a challenge to a "particular activity" of the BLM.

The Portland Audubon Society's renewed motion for summary judgment (# 149) is denied. The BLM's motion for summary judgment (# 161) is granted. The preliminary injunction shall be vacated and judgment entered for the BLM. The BLM should prepare the appropriate documents.